UNITED STATES of America, Plaintiff,

v.

UNDETERMINED QUANTITIES OF AN ARTICLE OF DRUG LABELED AS "EXACHOL," et al., Defendants-in-Rem,

U.S. Health Club, Inc., Claimant.

No. 87 Civ. 7779 (RWS).

United States District Court, S.D. New York.

July 11, 1989.

Benito Romano, U.S. Atty., S.D.N.Y., New York City, for plaintiff; Paula T. Dow, Asst. U.S. Atty., of counsel.

Bass & Ullman, New York City, for claimant; Jacob Laufer, Susan C. Stolzer, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff the United States Federal Food and Drug Administration ("the FDA") moves for summary judgment pursuant to Rule 56, Fed.R.Civ.P. against defendant U.S. Health Club, Inc. ("Health Club") seeking to condemn the seized Exachol as a misbranded and unapproved new drug. Because Exachol is entitled to be considered under the Health Claims for Food Policy, the motion for summary judgment is denied.

*The Parties*

The FDA is an agency of the United States Government. It develops regulations and information programs and conducts research required to ensure the nutritional adequacy of the national food supply, to enhance the ability of the American consumer to utilize the food supply effectively, and to improve use of modern nutrition principles for dietary management of disease and injury.

Health Club is a New York corporation with its principal place of business in New York. It is the owner of the seized product.

Defendant-in-rem Exachol is the article that has been seized in addition to related catalogs, letters and brochures that constitute advertisements for the product. They were shipped in interstate commerce from New Jersey to New York and are now located in New York.

*Prior Proceedings*

The FDA filed a complaint in this action on October 30, 1987. Pursuant to an *in rem* arrest warrant issued by this Court the United States Marshal seized the article on November 6, 1987. The FDA filed an amended complaint on May 20, 1988. On November 30, 1987, Health Club filed a claim to the seized drug. The instant motion was considered on affidavits, argued and fully submitted on March 17, 1989. The facts set forth below are uncontested except as noted.

*The Facts*

1. The Distribution of Exachol

Health Club manufactures and sells a product which until April 1987 was known as the Atherex Institute Formula and thereafter was distributed under the name "Exachol". Exachol is comprised of lecithin, phosphatidyl ethanolamine, phosphatidyl choline, lethicon, phosphatidyl inositol, extract of chondrus crispus, carrageenan extract, silicon, niacin, and "compounded plant extract," all apparently natural products found in food. It is manufactured by Phoenix Laboratories, Inc., in Hicksville, New York. It is then repackaged and labelled by Health Club in Hastings-on-Hudson. According to Health Club, the ingredients used in Exachol are commonly available as food supplements for which scientific data as to their effectiveness is publicly available.

In 1985, 1986 and 1987, the FDA received complaints and inquiries from physicians, consumers, and state health departments about literature being distributed by Health Club stating that Exachol is useful for the prevention and treatment of coronary disease. According to the FDA, an inspection conducted on December 8, 1986, revealed that the labelling and promotion of Exachol asserts that Exachol is effective in the prevention and treatment of coronary thrombosis, arteriosclerosis, atherosclerosis and angina. The labelling also stated that Exachol will prevent cholesterol deposits from forming on the walls of a

person's arteries. The FDA also obtained promotional literature including a catalog, brochure, pamphlet and business reply card.

According to Health Club, each package for sale is accompanied by an instructional brochure which explains the purpose and use of the comprehensive Exachol three-way plan. The three steps of the plan are: (1) proper eating; (2) moderate exercise; and (3) inclusion of the Exachol supplement. The instructions state that:

> Exachol is a nutritional, dietary supplement, invaluable for the maintenance and protection of health and nutrition.

Health Club solicits orders through a mail order brochure which states in part:

> The Exachol Program is a preventive plan designed to help you keep your cholesterol under control by a combined approach including moderate exercise, proper eating and Exachol capsules. It is not intended as a substitute for any medical treatment your medical condition may require.

### 2. FDA Enforcement

On April 9, 1987, FDA sent Health Club a regulatory letter which stated that Exachol was a drug within Section 201(g) of the Federal Food, Drug and Cosmetic Act. The letter indicated that the continued marketing of the product would constitute a violation of sections 502(a), 502(f)(1) and 505(a) of the Act. On May 1, Health Club responded by letter disagreeing with the FDA's conclusion that Exachol does not fall within the health information guidelines of the FDA's Center for Food Safety and Applied Nutrition.

On May 4, 1987, FDA wrote to Health Club asking whether it would discontinue distribution of Exachol as a misbranded and unapproved new drug in interstate commerce. Health Club responded on May 12, 1987 that it would not.

On July 27, 1987, and August 14, 1987 FDA conducted an inspection of Health Club to determine whether the firm was continuing to distribute Exachol in interstate commerce and concluded that it was. The investigators obtained copies of promotional literature which Health Club was still mailing.

A meeting between FDA officials and Health Club's attorney occurred September 15, 1987. According to Health Club, as a result of this meeting it ceased distribution of certain of its promotional literature and submitted a revised labelling plan to be utilized for the Exachol program. The FDA was not satisfied with the revisions and thereafter instituted this seizure action against the product Exachol.

Around the same time the FDA issued thirty-four other regulatory letters to companies that marketed vitamin and mineral products similar to Exachol warning manufacturers that their products would be subject to Government seizure if they continued to use labelling which made therapeutic claims. The FDA discovered only one other company that continued to market its food supplement as a drug after receiving such a regulatory letter. The FDA proceeded against this company. *See United States v. Undetermined Quantities of Nu–Path*, 86–1027, (D.S.D., June 16, 1986). The FDA has also sent regulatory letters to sixty-four fish oil supplement manufacturers which were promoted for use "in the treatment and prevention of heart disease, and the lowering of cholesterol and triglyceride levels."

### 3. The Proposed Rule on Health Messages

On August 4, 1987, the FDA published the Health Claims for Food Policy in the form of a Notice of Proposed Rulemaking concerning the content of health-related claims or information placed on food labelling and the criteria applied to evaluate the propriety of such labelling. Pending the rulemaking proceeding, the FDA decided to apply the proposed criteria to any questioned labelling:

> (1) Information on the labelling must be truthful and not misleading to the consumer

> (2) The claims should be supported by valid, reliable, scientific evidence that is

publicly available (prior to any health related claim being made)

(3) The claims must be consistent with generally recognized medical and nutritional principles.

(4) Food labels containing a health-related claim must also contain the nutrition labelling information required by 21 CFR § 101.9.

The FDA also indicated that it would apply the same criteria to dietary supplements, noting that it may be more difficult for dietary supplements to meet the criteria.

### 4. Application of the Rule

The FDA's policy and application of the Health Claims for Food Policy to at least two products is relevant here. In 1984, the Kellogg Company ("Kellogg") began to promote its All–Bran cereal ("All–Bran") with labelling that recommended in connection with the prevention of cancer that consumers "eat high fiber foods, eat foods low in fat, eat fresh fruits and vegetables, eat a well-balanced diet and avoid being overweight." The FDA drafted a regulatory letter to Kellogg's suggesting that the labelling could be misleading and that the label promotes All–Bran as a product effective and adequate in the prevention of cancer. The letter charged Kellogg's with violations of both the food and drug provisions of the Act. However, the letter was never sent, and there was no action taken against Kellogg's regarding the All–Bran product.

On February 12, 1988, Congressman Theodore Weiss made a request for an assessment of whether the Kellogg labelling met the standards of the FDA's health claims proposal. The FDA responded that it would wait until it had developed a single standard for considering health related information or food labels before determining whether Kellogg's claims were misleading. The FDA contended that All–Bran is both a food and a drug and that, as is its right, it will decline to treat All–Bran as a drug and will not prosecute Kellogg on the basis of scientific evidence which indicates that the labelling is not misleading.

With respect to the fish oil products the FDA advised the manufacturers to identify those claims each would remove from the labels and to propose the appropriate claims they would include. On June 1, 1988 the FDA advised the Council for Responsible Nutrition ("CRN"), an agency which had responded on behalf of the manufacturers, that the FDA was reviewing the scientific basis for the fish oil labelling claims and would not initiate any proceeding until it had completed such review. This letter further stated that the labelling would be judged by the criteria contained in FDA's health messages proposal and that the FDA would give the industry a fair opportunity to complete its submission of scientific evidence substantiating the health benefits of fish oils and ninety days after the completion of the guidelines to bring their labelling into compliance. FDA reserved its right to bring enforcement action against those companies making therapeutic claims for fish oils that would not be permitted under the health messages proposal no matter how well substantiated.

*Conclusions*

*Summary Judgment is an Appropriate Remedy*

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *See id.* at 247–48, 106 S.Ct. at 2509–10; *Corselli v. Coughlin*, 842 F.2d 23 (2d Cir.1988). All doubts are resolved against the moving party, and all favorable inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 269,

98 L.Ed.2d 226 (1988); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (1983). The Supreme Court recently has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Here, the Health Club in its Rule 3(g) Statement has raised no issue of fact although it resists strenuously the FDA's view of the ultimate facts. The one factual issue raised as contested relates to the state of recognition by experts of Exachol as safe and effective.

*Exachol is a Drug under 21 U.S.C. § 321*

Congress has limited the FDA's ability to regulate "special dietary" foods as well as the placement of health-related claims or information on food labelling. However, the FDA's regulatory power over the labelling and marketing of a product which can be classified as a drug is far broader. Therefore, the initial issue to address is whether the Exachol product can be regulated as a drug.

21 U.S.C. § 321(g)(1)(B) defines a drug as any article "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man...." If the intended use of a product is therapeutic, that article can be regulated as a drug. *National Nutritional Foods Ass'n. v. Mathews*, 557 F.2d 325, 334 (2d Cir.1977). The vendor's intent in the sale of the product to the public is key in the determination of whether a product may be regulated as a drug. *Id.* at 333. The FDA is not bound by the vendor's subjective claims of intent, but can find actual therapeutic intent on the basis of objective evidence. *Id.* at 334. This intent may be derived from the labelling, promotional material, advertising or any other relevant source. *U.S. v. Storage Spaces*, 777 F.2d 1363 (9th Cir.1985), 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 148. An article intended to be used as a drug will be regulated as a drug. *U.S. v. Article of Drug ... "Sudden Change"*, 409 F.2d 734, 739 (2d Cir.1969); 21 C.F.R. § 201.128. This is true even if the products labelling states that it is not a drug. *United States v. Nutrition Services, Inc.*, 227 F.Supp. 375, 387 (W.D.Pa.1964).

Classification of an article as a food under subsection (f) does not preclude its classification as a drug under subsection (g). *National Nutritional Foods*, 557 F.2d 325 at 334. *U.S. v. Three Cartons, More or Less, "No. 26 Formula GM etc.,"* 132 F.Supp. 569 (D.C.Cal.1952). A product which occurs naturally or is derived from natural ingredients is capable of regulation as a drug. *See United States v. Vitasafe Formula M*, 226 F.Supp. 266, 277 (D.N.J. 1964), 345 F.2d 864 (3d Cir.1965); *National Nutritional Foods*, 557 F.2d at 334. Regardless of the physical effect of the product, once it is established that its intended use brings it within drug definition, the product will be deemed a drug, and can be regulated as such. *Sudden Change*, 409 F.2d at 739 and 21 C.F.R. § 201.128.

Both the previous labelling and the revised labelling after October, 1987 have been advanced to determine Health Club's marketing intent. Courts have recognized that where years later customers purchase a product in reliance on the therapeutic claims of the previous literature marketed with that product, the court may use such literature to determine the intent in marketing the product despite a later disclaimer. *United States Nutrition Services, Inc.* 227 F.Supp. 375, 387 (W.D.Pa.1964); *U.S. v. Three Cartons, More or Less*, 132 F.Supp. 569, 574 (D.C.Cal.1952). The fact that the literature is no longer distributed does not negate the effect that literature will have on those purchasers who were familiar with it. *Id.*

However, no evidence has been submitted here that the effect of the earlier literature remains in the marketplace. The change in labelling without the change in composition or form of the product should not give rise to a change in classification unless premised upon a change in the manufacturer's intent. However, a change in labelling that could change the classification of a product is evidence of such a

change in intent. Indeed, it was just such a change that the FDA sought to accomplish in its meeting with the Health Club in the course of the enforcement effort described above.

Although Health Club has presented no direct evidence that its intent in marketing the product has changed, the labelling has indeed been revised. Both the old and the revised labelling are relevant for the purposes of determining whether Health Club intended to market as a drug. At the same time the Health Club is not stigmatized for all time by its earlier literature.

■ The Exachol Plan does make therapeutic claims for the "prevention of disease in man": "The Atherex method acts in a number of ways to help prevent cholesterol deposits from forming", "the Atherex method of preventive care ... may add years to your life." "Many are cut down suddenly in the prime of life but the Exachol plan can definitely help to prevent this in many cases." "The Atherex plan is now here to help you protect against a possible sudden heart attack and coronary disease." The revised literature states "coronary thrombosis (heart attack) is ... the result of ... fatty deposits.... This can cause a heart attack. The Exachol plan of preventive care helps to protect you from sneak attacks caused by this insidious condition." The program itself is defined as "the Exachol 3–way Prevention Program," designed as "a preventive plan". These claims describe a product which consumers will purchase to prevent cholesterol build-up and thereby prevent heart disease. One can infer from the labels that Health Club intended to achieve this therapeutic effect with consumers and therefore intended the product to be used to prevent heart disease.

Health Club asserts that it is marketing a health plan, rather than just the Exachol product and that therefore, any preventive or therapeutic claims which it makes do not apply to the capsules alone but to the entire plan. However, Health Club's initial labelling and promotional literature did not focus on all three parts of the program. The capsules themselves carry the same name as the overall plan. The purchasing coupons picture only a bottle of capsules and offer no mention of any brochures or diet plans, simply a supply of capsules. An entire page is devoted to the content of the capsules with no mention of the other two parts of the Exachol plan. It is therefore foreseeable that a consumer would associate the claims made about the plan with the capsules alone without even realizing there is a second and third step to the program.

The more recent promotional literature, however, does refer to diet ("the Prudent Diet") and exercise with more frequency, and discusses a "combined approach including moderate exercise, proper eating and Exachol capsules." The purchasing coupon includes mention of the "Plan", and the other literature actually has a picture of a pamphlet containing details of the program in addition to the bottle of capsules. However, these changes do not shift the focus of the inquiry from the Exachol capsules to the plan as a whole. Although the recommended program combines three elements, each step is independent of the other. There is no indication that the capsules cannot be used without the other two steps. The association of all three elements therefore will not change the nature of any one of them, and Exachol, once classified as a drug, cannot escape that classification by virtue of its association with exercise and diet.

Exachol is the focus of the plan and the only consumable article which is purchased. Therefore Health Club's claims for Exachol fit within the FDA's definition of therapeutic messages: "generally ... ones that focus on the cure, mitigation or treatment of a disease or disorder through the use of an identified single entity or substance in and of itself, in the manner traditionally associated with drug—like activity—not by adherence to a total dietary plan."

The claims clearly identify a product which is intended to prevent cholesterol deposits and thereby to mitigate the possibility of coronary thrombosis. Avoidance and prevention are synonymous here for lowering one's cholesterol level which both prevents and avoids heart disease. Here

the Health Club is not advocating simply complete or partial avoidance of cholesterol intake, but the use of Exachol pills to prevent the build up of cholesterol on arterial walls. Thus, Health Club's therapeutic and preventive claims indicate that the FDA could properly classify Exachol as a drug.

It therefore follows that Exachol could be considered a "new drug" within the meaning of 21 U.S.C. § 321(p) and the Health Club has failed to file a new drug application under 21 U.S.C. § 355(a) or notice of investigational exemption under 21 U.S.C. § 331(d). However, the Health Club has chosen not to file as a "new drug." Instead, Exachol seeks treatment as a "special dietary food" under the Health Claims for Food policy. Similarly, Exachol seeks to avoid the FDA claim of misbranding under 21 U.S.C. § 334(a)(1) on the basis that its labelling is not misleading under the same policy.

*Exachol is a Special Dietary Food*

■ Health Club does not maintain that Exachol is a food within the definition of 21 U.S.C. § 321(f). Exachol is, however, a special dietary food. 21 U.S.C. § 350(c)(3)(A) applies the term "special dietary use" to a food which purports to be used by man to supply "a special dietary need that exists by reason of a physical, physiological, pathological or other condition, including but not limited to the condition of disease, convalescence, pregnancy, lactation, infancy, allergic hypersensitivity to food, underweight, overweight, or the need to control the intake of sodium." Such a food must be intended for a particular purpose. 21 C.F.R. § 105.3(a)(1).

In the past, the FDA has considered foods for a special dietary use as those which are to be used by people who already suffer from a disease or disorder such as obesity or diabetes. The products are produced and marketed particularly for those consumers and not for the general public. Similarly, Exachol is targeted to people who already have a heart condition or a high cholesterol level as evidenced by its claims that Exachol "helps to get the cholesterol level in your blood under control."

The product does address a special dietary need that a person with a high cholesterol content has. It is therefore a food for special dietary use within the definition of 21 U.S.C. § 350(c)(3)(A).

*Applicability of Health Claims for Food Policy*

■ Under the health claims policy, a company is permitted to label its food or food supplement with appropriate health related messages without the product being rendered "misbranded" or a "drug" under the Act.

In his testimony before the Subcommittee investigating FDA's proposal to permit health claims on food labels, Thomas Scarlett, then FDA Associate General Counsel, Food and Drug Division, Office of the General Counsel, made precisely this point:

> The premise for permitting health claims on food labelling without requiring pre-market clearance under the new drug provisions of the act is that there are statements that can be made describing accurately the relationship between a food and a physiological condition, *including a disease condition,* that are not drug-like and do not render the food a drug within the meaning of the Federal Food, Drug and Cosmetic Act, and this is the Agency's first cut at attempting to explain the circumstances in which a claim of that nature would be regarded as a health claim that is not a drug claim. (Emphasis added).

*FDA Proposals To Permit The Use Of Disease Specific Health Claims On Food Labels: Hearing Before A Subcommittee Of The Committee On Government Operations Of The House Of Representatives,* 100th Cong., 1st Sess. 54 (1987).

After the Subcommittee hearing, a member of the Subcommittee submitted a list of follow-up questions to Commissioner Young for FDA response. One question directly focused on the issue of therapeutic claims:

> Would you please explain what you mean by therapeutic messages on labels, and whether these claims would be permissible under your proposal?

By letter dated March 11, 1988, the FDA responded:

> Although definitive distinctions are difficult, in general "therapeutic" messages are ones that focus on the cure, mitigation, or treatment of a disease or disorder through the use of an *identified single entity or substance in and of itself,* in the manner traditionally associated with drug-like activity—not by adherence to a total dietary plan. The proposed regulation would not permit such drug-like claims. (Emphasis added).

The labelling for the Exachol plan urges consumers to follow a low fat, low cholesterol diet, engage in moderate exercise and supplement the diet with the Exachol product.

Further, the FDA has stated that it will now employ the proposed criteria in determining when enforcement actions should be instituted:

> Pending this rulemaking proceeding, the agency will employ the criteria discussed in evaluating the propriety of bringing enforcement action against products bearing health messages on food labelling.

52 Fed.Reg. 28843 (1987).

According to the FDA, this policy is inapplicable to Exachol because Exachol is a drug. The correct inquiry, however, is whether the labelling accompanying Exachol is consistent with the criteria discussed by FDA for the type of health claim which does not trigger the drug provisions of the Act.

Health Club claims that other companies such as the Kellogg Company, Mazola and Fleischmann are distributing products bearing labels with claims linking diet, nutrition, exercise and their products with health and avoidance of disease conditions. Specifically the FDA's application of the health claims rule to Kellogg's All Bran and various fish oil products before determining whether they will be regulated as drugs indicates that Health Club has been treated in a manner inconsistent with the FDA's established policy.

Health Club has shown that Exachol was similarly situated to the other two products. All-Bran is a food within the definition of 21 U.S.C. 321(f) since it is used by man for food. Exachol too is a food, for a special dietary use. Like All-Bran, Exachol can be regulated as a drug as well. The FDA has declined to regulate All-Bran as a drug until it has developed and applied one standard for considering health related information on food labels. As a result, the Health Claims for Food Policy, which applies to foods, should be applied to both products since the effect of the current labelling of each is virtually undistinguishable.

The FDA claims that Health Club has not submitted evidence similar to Kellogg's scientific evidence upon which the FDA based its decision indicating that its labels were not misleading. However, this did not constitute grounds for the prosecution of the fish oil manufacturers. The FDA has withheld review of the scientific evidence submitted by the fish oil manufacturers and classification of the fish oil products until after the health claims policy is applied. Further the FDA has given the fish oil manufacturers additional time to compile their evidence despite the fact that at the time the regulatory letters were written to the fish oil manufacturers, the FDA was "unaware of any history of fish oil use as a food supplement" or that there was any evidence to indicate that the product was approved as a food supplement or generally recognized as safe. The FDA was also aware of scientific studies indicating possible adverse effects of prolonged consumption of the fish oil products.

The FDA has not indicated any knowledge of scientific evidence that suggests Exachol will have adverse effects upon its consumers. The FDA has apparently already reviewed Exachol's scientific evidence without awaiting the formalization of the health claims policy. There is no evidence offered here that the fish oil companies are compiling scientific data that will substantiate their claims of the health benefits of fish oils any more than the evidence which Health Club may present to substantiate its claims. Further the FDA has given no indication that the scientific

evidence which Kellogg submitted, characterized in a letter responding to Congressman Weiss's request for an assessment of the Kellogg labelling, as "some epidemiological data [which] support the statements being made [and] other data, including animal and clinical studies [which] are less conclusive," will significantly differ from that which Health Club has provided or may provide. Because the FDA makes no clear distinction between the scientific evidence presented for each product it has not sufficiently disputed Health Club's claim that Exachol is similarly situated to All–Bran and the fish oil products.

Finally the FDA has not set forth its criteria for distinguishing which products are similar to Exachol and which are not. The Health Club has made a sufficient showing of its similarity to products to be considered under the Health Claims for Food Policy against which judicial action was not taken.

Courts reviewing administrative action require consistency from the government—whether the context be the denial of a regulatory exemption, *see, e.g., Airmark Corp. v. F.A.A.,* 758 F.2d 685 (D.C.Cir. 1985); *Frozen Food Express, Inc. v. United States,* 535 F.2d 877 (5th Cir.1986); the denial of a license, *see, e.g., Contractors Transport Corp. v. United States,* 537 F.2d 1160, 1162 (4th Cir.1976); or the issuance of a cease and desist order, *see, e.g., Marco Sales Co. v. Federal Trade Commission,* 453 F.2d 1, 7 (2d Cir.1971); *Mary Carter Paint Co. v. Federal Trade Commission,* 333 F.2d 654 (5th Cir.1964), *rev'd on other grounds,* 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128 (1965).

In every context, the overriding principle of fairness is always the same: the government must govern with an even hand. *See, e.g., Airmark Corp. v. F.A.A.,* 758 F.2d 685, 692 (D.C.Cir.1985) ("Elementary evenhandedness requires that if all five factors must be met by one petitioner [for a regulatory exemption] then all five factors must be met by the next"); *Contractors Transport Corp. v. United States,* 537 F.2d 1160, 1162 (4th Cir.1976) (rejecting "[p]atently inconsistent application of agency standards to similar situations"); *Marco Sales Co. v. Federal Trade Commission,* 453 F.2d 1, 6 (2d Cir.1971) ("it is not that the Commission has failed to act against others but that it has adopted a positive regulatory approach to them totally inconsistent with its approach toward petitioners"); *Mary Carter Paint Co. v. Federal Trade Commission,* 333 F.2d 654, 660 (5th Cir. 1964) (Brown, J., concurring), *rev'd on other grounds,* 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128 (1965) ("law does not permit an agency to grant to one person the right to do that which it denies to another similarly situated").

In *United States v. Diapulse Corp. of America,* 748 F.2d 56 (2d Cir.1984), the same standard of evenhandedness was required. There, the Diapulse Corporation of America sought to modify an injunction issued several years earlier in an enforcement action by the FDA, which prohibited Diapulse from marketing one of its products. Diapulse had moved to modify the injunction because the FDA had subsequently approved the same product for sale by a different company. Despite FDA objection, the district court agreed to a modification of the injunction. This decision was affirmed by the Second Circuit.

In explaining its affirmance, the Second Circuit declared that the government must act "evenhandedly" and that it could "not 'grant to one person the right to do that which it denies to another similarly situated.'" *Id.* at 62, *quoting Marco Sales Co. v. Federal Trade Commission,* 453 F.2d 1, 7 (2d Cir.1971). In the future, the Court instructed, the government could not continue "to treat like cases differently," and "must apply to [Diapulse] the same scientific and legal standards it applies to [Diapulse's] competitors." *Id.* at 62. *See also Ger–Ro–Mar, Inc. v. Federal Trade Commission,* 518 F.2d 33, 35 (2d Cir.1975) (the government cannot give "its blessings to [petitioner's] competitors while condemning [petitioner]").

Because the FDA has not treated Exachol under its Health Claims for Food Policy, it has applied an uneven regulatory

policy, requiring denial of the requested summary judgment.

*Conclusion*

For the reasons set forth above, the government's motion for summary judgment is denied.

It is so ordered.