**KELLOGG COMPANY, Plaintiff,**

v.

**Jim MATTOX, Attorney General of the State of Texas, et al., Defendants.***

**Civ. A. CA 3–90–2005–G.**

United States District Court,
N.D. Texas,
Dallas Division.

April 3, 1991.

As Amended April 12, 1991.

---

* Editor's Note: The caption was amended by the court, see p. 1386.

Terrell Wallace Oxford, Susman & Godfrey, Dallas, Tex., Frederick P. Furth, Daniel S. Mason, Bruce J. Wecker, Michael P. Lehmann, George F. Bishop, and Scott R. Campbell, Furth Fahrner & Mason, San Francisco, Cal., for plaintiff.

Joselle Marie Albracht, Stephen Henry Gardner, and Craig A. Jordan, Atty. Gen. of Texas, Dallas, Tex., and Dan Morales, Texas Atty. Gen., Austin, Tex., for defendants.

## MEMORANDUM ORDER

FISH, District Judge.

This case is before the court on the motion of plaintiff Kellogg Company ("Kellogg") for a preliminary injunction. For the reasons stated below, the motion is denied.

## FINDINGS OF FACT

### I. *Nature and Status of Suit*

1. This suit was filed by Kellogg against Texas Attorney General Jim Mattox and Commissioner Robert Bernstein of the Texas Department of Health ("TDH") (collectively, the defendants will be referred to as "the State" or "Texas"). Kellogg's complaint alleges claims for injunctive and declaratory relief under the Commerce Clause of the United States Constitution (U.S. Const., Art. I, § 8); the Supremacy Clause of the Constitution (*id.*, Art. VI, cl. 2), based on preemption by the Federal Food, Drug and Cosmetic Act ("FDCA") (21 U.S.C. § 301 et seq.); violation of the First Amendment; and violation of the Equal Protection Clause of the Four-

teenth Amendment. Kellogg also seeks a declaration, pursuant to the Federal Declaratory Judgment Act (28 U.S.C. § 2201 et seq.), that its ready-to-eat ("RTE") cereal Heartwise is not being marketed in violation of the Texas Food, Drug, and Cosmetic Act ("Texas Act").

2. Kellogg's complaint was filed on August 30, 1990. On various dates in September, 1990, as will be explained below, TDH detained packages of Heartwise at warehouse locations in Texas. Kellogg responded by filing an application for a temporary restraining order, which was denied on September 7, 1990.

## II. *The Parties*

3. Kellogg, a Delaware corporation, maintains its principal place of business at Battle Creek, Michigan. Its activities include the manufacture and sale of RTE breakfast cereals, including Heartwise.

4. Defendant Jim Mattox was the attorney general of Texas when this suit was filed. He has been succeeded in that office by Dan Morales.

5. Defendant Robert Bernstein is the Commissioner of TDH.

## III. *Analysis of the Evidence*

### A. *The Introduction of Heartwise Cereal*

6. Beginning on August 31, 1989, Kellogg introduced Heartwise cereal to the nationwide market. Affidavit of John R. Aubuchon ("Aubuchon aff.") ¶ 7.

7. Heartwise is an RTE cereal. It contains less than 3 grams of psyllium per serving. Deposition of Victor Fulgoni ("Fulgoni dep.") 34:13–35:5. Psyllium is a grain grown primarily in India. Psyllium is also the primary ingredient in various bulk-forming laxatives, including Metamucil and Fiberall. Affidavit of Victor Fulgoni ("Fulgoni aff.") ¶ 6.

8. Heartwise cereal is distributed and sold in the same manner as other RTE cereals manufactured and distributed by Kellogg. It is manufactured in the same facilities as other RTE cereals manufactured by Kellogg, and is shipped along with other RTE cereals to retail grocers and others. Heartwise cereal is displayed in retail grocery stores in the same section of the stores and alongside other Kellogg RTE cereals. The sale of Heartwise cereal in Texas and the advertising relating to that product are part of a national sales program. Aubuchon aff. ¶¶ 13–14.

9. According to Kellogg, it intended from the outset that Heartwise cereal would be sold and advertised exclusively as a food, not a drug, product. The State, on the other hand, maintains that Kellogg designed Heartwise cereal for use in the cure, mitigation, treatment, or prevention of elevated serum cholesterol and diseases of the circulatory system. Determination of intent, particularly the intent of a non-natural person such as Kellogg, cannot be resolved short of trial.

10. Kellogg has not shown that any state or federal agency or any court has ever determined that psyllium, at the levels found in Heartwise, is "generally recognized as safe" ("GRAS") for human consumption. Fulgoni dep. 61:5–66:25.

11. The United States Food and Drug Administration ("FDA") has never determined that psyllium is GRAS for foods at the levels found in Heartwise. Fulgoni dep. 65:21–66:3. Although Kellogg has requested such a finding from FDA, to date that agency has not made that determination. Indeed, in one document before the court that indicates the FDA's preliminary position, a high-ranking FDA official raises concerns about (1) the potentially misleading nature of claims on Heartwise labelling; (2) the introduction of significant amounts of psyllium into food without an appropriate safety review; (3) specific safety concerns associated with the use of psyllium, including allergic reactions; (4) the inapplicability of the conclusions of the SCOGS[1] committee; (5) the inadequacy of

---

1. SCOGS was the "Select Committee on GRAS Substances," set up by FDA to make recommendations to FDA on issues relevant to GRAS substances.

data with respect to drug use of psyllium to establish its safety in foods; and (6) whether, at the levels of psyllium in Heartwise, Heartwise may be a drug or a delivery vehicle for a drug. Fulgoni aff. exhibit C.

12. Kellogg has not shown that FDA has recognized psyllium as safe and effective for reducing serum cholesterol. In fact, the FDA rejected just such a request filed with it by the manufacturer of Metamucil. Fulgoni dep. 67:14–20; affidavit of Joselle M. Albracht ("Albracht aff.") exhibit 3 at 1.

13. The position of the FDA with respect to cholesterol reduction claims for foods is set forth in a recent regulatory letter sent to the Ralston Purina Company regarding Oat Chex cereal. The FDA said that the "potential hypocholesterolemic effects associated with intakes of dietary fibers ... are generally limited to the soluble components of dietary fibers when consumed by hyperlipidemic individuals at very high levels as part of a low fat, low saturated fatty acid and low cholesterol total diet.... To date the Food and Drug Administration has not yet made an independent determination as to whether there is an adequate scientific basis to support label claims that soluble fiber ... is effective in lowering serum blood cholesterol and risk of coronary heart disease in the U.S. population." Albracht aff. exhibit 2.

14. The cholesterol-lowering effect Kellogg asserts for psyllium is not attributable to its nutritional value when consumed over time, as is the case with a food, but rather as the result of an immediate pharmacological response, as is the case with a drug. Fulgoni aff. exhibit J at 3. The clinical studies relied upon by Kellogg are short term studies that purport to demonstrate an immediate cholesterol-reducing effect attributable to psyllium. *See, e.g.,* Fulgoni aff. exhibit F at 550 (three-week study), 928 (eight-week study), and 1006 (five-week study).

### B. *Safety of Psyllium*

15. Dr. Victor L. Fulgoni, III, vice president of research and nutrition for Kellogg, made a private determination in March of 1988 that psyllium is GRAS within the meaning of 21 U.S.C. § 321(s). He based his analysis on 19 items of published literature, including a 1982 report of the eleven member Select Committee on GRAS Substances. Fulgoni aff. ¶ 10 and exhibit B; Fulgoni dep. 54:11–55:5; 72:3–75:17 (confirming conclusion as to psyllium's GRAS status). He was unable, however, after a lengthy search of scientific articles on psyllium, to find any indication that psyllium was safe in food in the levels found in Heartwise. Fulgoni dep. 74:2–6.

16. SCOGS did not make a determination that psyllium was safe for use in foods at the levels found in Heartwise. On the contrary, SCOGS said only that psyllium in foods in a level one-twentieth that found in Heartwise was safe. Fulgoni dep. 66:13–23, 65:5–10. There is no indication that SCOGS anticipated the use of psyllium at the levels found in Heartwise. Fulgoni aff. exhibit J at 2.

17. Although psyllium was previously listed by the FDA as GRAS for consumption in food in a very small concentration as an ice cream stabilizer, even that use is not currently listed by the FDA as GRAS. Fulgoni dep. 64:10–65:4.

18. In reaching its conclusions regarding psyllium, SCOGS did not review any significant food use, but only drug use as a bulk laxative in products such as Metamucil and Fiberall. Fulgoni aff. exhibit D.

19. In fact, SCOGS found in 1982 that there were no current food uses of psyllium. Fulgoni aff. exhibit D and exhibit J at 2.

20. At this time, the only generally recognized use of psyllium for human consumption in this country is as a bulk laxative in products such as Metamucil and Fiberall. As such, psyllium is a known drug active, having been recognized by the FDA as safe as a bulk laxative. Fulgoni aff. ¶ 14 and Albracht aff. exhibit 3.

21. Heartwise, by virtue of the manner in which it has been produced and marketed, is a delivery medium for psyllium, a known drug active. Albracht aff. exhibit 3.

22. The Procter & Gamble Company, a competitor of Kellogg, has opposed any FDA determination that psyllium is GRAS for food use, despite the fact that Procter & Gamble sells a drug product, Metamucil, that contains psyllium in approximately the same levels as are present in Heartwise. Fulgoni aff. exhibit J and Albracht aff. exhibit 3. Procter & Gamble has also objected to the use of psyllium in food in connection with a cholesterol reduction claim, because it was previously prohibited from making such a claim. Albracht aff. exhibit 3.

23. The FDA has recently written to Kellogg with respect to statements Kellogg has made to the court in this lawsuit, in order "to correct certain statements or impressions ... about the meaning of FDA regulatory activity concerning Kellogg's Heartwise cereal." Albracht aff. exhibit 1. This letter is dated September 27, 1990, and signed by L. Robert Lake, Director of FDA's Office of Compliance, Center for Food Safety and Applied Nutrition. The letter further states that Kellogg's assertions to this court "create the misimpression that the absence of FDA enforcement action constitutes a determination by FDA that the product is lawful. This is not the case." The letter goes on to make the point that "*deferral* of a regulatory action should not be interpreted as an agency determination that a product is lawful" [emphasis added]. This letter is entitled to great weight when considering the policies of the FDA as they affect this suit.

24. On October 9, 1989, Kellogg filed with the FDA a "Petition By Kellogg Company To The United States Food And Drug Administration Proposing A Multi–Purpose Affirmation That Psyllium Seed Husk Gum Is Generally Recognized As Safe For Use In Grain–Based Foods" ("Kellogg's GRAS petition"). Fulgoni aff. ¶ 20 & exhibit D.

25. Kellogg filed five supplements to its GRAS petition on November 20, 1989; December 4, 1989; January 25, 1990; August 15, 1990; and March 1, 1991 ("supplements"). Fulgoni aff. exhibits E, F, G, and H. The FDA's notice in the Federal Register concerning Kellogg's petition was published in early February, 1990. 55 Fed. Reg. 4481 (Feb. 8, 1990). Fulgoni aff. exhibit I. After 60 days, only two substantive comments were received on the petition; the state of Texas filed no comment. Fulgoni aff. exhibits J and K. Kellogg responded to these comments in a supplemental submission filed on August 15, 1990. Fulgoni aff. ¶ 22 and exhibit H. To date, the FDA has not ruled on Kellogg's GRAS petition.

26. Although Kellogg asserts that Texas has never taken action against any product that contains psyllium, other than Heartwise cereal, the record indicates that General Mills was advised never to sell Benefit, its psyllium-containing cereal, in Texas, and it never did so. Fulgoni dep. 144:5–145:6.

C. *Labelling of Heartwise Cereal*

27. Kellogg's initial packaging for Heartwise cereal depicted a heart symbol with the word "psyllium" on the front panel and contained the logo of, and reference to, the Henry Ford Hospital Heart & Vascular Institute ("Henry Ford Hospital"). The back panel had the caption "A low fat, high soluble fiber diet can lower cholesterol." Below that caption appeared the following copy:

> At the Henry Ford Hospital Heart and Vascular Institute, more and more is being learned about lowering cholesterol levels. According to medical research, a diet low in fat and high in soluble fiber can help lower cholesterol.
>
> At the Kellogg Company, we believe that *Heartwise* cereal can be part of that diet. It's high in soluble fiber, a special kind of fiber you won't find in many cereals. In fact, ounce for ounce, *Heartwise* cereal has more soluble fiber than oat bran. Once you get a taste of the crunch flakes in *Heartwise* cereal, you'll see that a low-fat, high-soluble fiber diet can be an uplifting experience.

Aubuchon aff. ¶ 8. Kellogg's use of the name and symbol of the Henry Ford Hospital was the product of a license agreement between Kellogg and the hospital. Aubuchon aff. ¶ 9; Fulgoni dep. 124:1–9. This copy constituted an endorsement of Heart-

wise by the hospital. Fulgoni dep. 124:15–19.

28. Commencing in April of 1990, Kellogg began printing revised packaging that continued to use the heart symbol with the word "psyllium" on the front panel and made references on the back panel to the Riverside Heart Institute of Riverside Methodist Hospitals ("Riverside Institute"). This promotion was the product of an agreement between Kellogg and the Riverside Institute. Fulgoni dep. 112:3–113:23. On the back panel of this new packaging was a caption reading "A Helpful Guide To Lowering Your Cholesterol." Below that caption appeared the following copy:

> By now, you've probably heard a lot about the importance of controlling your cholesterol. After all, the Surgeon General's Report on Nutrition and Health states that lowering your blood cholesterol level reduces your risk of heart disease.
>
> But what can you do to help lower your cholesterol? By using the guide below—prepared by Riverside Methodist Hospitals, one of the Midwest's largest medical centers dedicated to reducing the risk of heart disease—you can work toward a healthier, longer life. Eat a variety of foods. It sounds so simple, but they were right when they told you about the importance of the 4 food groups. Maintain a desirable body weight. And be sure to get your exercise. Jog, bicycle, swim or do some other kind of aerobic exercise at least 20 continuous minutes 3 times a week. You'll not only look better, you'll feel better.
>
> Cut back on fatty foods. Switch to leaner meats and trim all visible fats. Try poultry and seafood more frequently. Bake, broil, or grill instead of frying. And remember to limit the size of your portions—the size of a deck of playing cards is a good rule of thumb. Choose lowfat or skim dairy products. Limit egg yolk consumption to 3–4 per week. (You can substitute 2 egg whites for 1 whole egg in recipes—it's the yolk that contains the cholesterol.)
>
> Eat foods with soluble fiber. Like apples, dried beans and peas, citrus fruits and Kellogg's Heartwise. It's made with psyllium, a natural grain higher in soluble fiber than any other grain—even 8 times higher than oat bran.
>
> So take a word to the wise, by using this helpful guide from Riverside Methodist Hospitals, Columbus, Ohio and Kellogg's.
>
> It's just good, sound advice.

Interspersed with this text were cartoon-like figures of, *inter alia,* a man with a heart-shaped head and a deck of cards with the ace of hearts on top. Aubuchon aff. ¶ 9. This copy constituted an endorsement of Heartwise by the Riverside Institute. Fulgoni dep. 120:2–22.

29. Although Kellogg asserts that there is no evidence that Texas has ever taken action against any product that contains a heart-shaped symbol, other than Heartwise cereal, the record indicates that Texas has settled a dispute with Mazola margarine regarding cholesterol-reduction claims. Fulgoni dep. 143:21–144:4. Kellogg uses Mazola as an example of a product bearing a heart-shaped symbol on its packaging. Affidavit of Mark Walker and Beverly Brandon ¶ 2.

30. The record also indicates that the State has taken action against other companies for cholesterol-reduction claims, including Quaker Oats, Fulgoni dep. 142:6–10, and Fleischmann's margarine, Fulgoni dep. 142:13–143:20.

31. Kellogg has recently begun distributing a new version of its packaging for Heartwise cereal. These packages continue to use the message referring to the Riverside Institute. Also, on this new packaging, Kellogg no longer uses a heart symbol in connection with the word "psyllium" on the front panel. Aubuchon aff. ¶ 10. There is now a "Notice to New Users" regarding possible allergic reactions to Heartwise. Aubuchon aff. ¶ 11. This notice is in small type on the side panel of the package. Aside from the fact that it is "visible," Kellogg could not identify what would attract attention to it. Aubuchon dep. 132:24–133:6. In addition, the wording is unclear and cannot reasonably be expected to give adequate warning to

those who might suffer an allergic reaction. Affidavit of Richard A. Beauchamp, M.D. In any event, there is no evidence in the record that any of the TDH detention notices at issue on this motion for preliminary injunction were placed on this version of the packaging.

32. Research has demonstrated that the protein associated with psyllium, even at very low levels, causes allergic reactions in some individuals. Fulgoni aff. ¶ 28.

33. Kellogg is aware that certain individuals have allergic reactions to psyllium. Aubuchon aff. ¶ 11.

34. Kellogg acknowledges that consumers who have allergic reactions to psyllium ought to know that Heartwise contains psyllium. Aubuchon dep. 132:3–7.

35. Kellogg has received dozens of complaints from individuals alleging allergic reactions to Heartwise. Fulgoni dep. 81:22–82:7.

36. Kellogg received reports of allergic reactions to Heartwise within a few months of the time it introduced the product. Albracht aff. exhibit 9, seriatim.[2] Many of these reports urged Kellogg to include a warning of possible allergic reactions. Albracht aff. exhibit 9. Notwithstanding these urgings and its knowledge from other sources of the allergenicity of Heartwise, Kellogg continued to package and sell Heartwise with labelling that did not warn of the possibility of allergic reactions. Kellogg only began including any warning on its labelling of Heartwise shortly before this suit was filed.

37. The allergenicity of Heartwise is a contested material fact with respect to its use as a breakfast cereal.

38. Kellogg now uses the following advisory on side panels of Heartwise cereal cartons:

NEW USERS: A very small percentage of individuals, particularly some nurses and other health care providers who have been occupationally exposed to psyllium dust, may develop a sensitivity to psyllium. This sensitivity may result in an allergic reaction.

On future packages, Kellogg says that it intends to highlight this advisory with a yellow background. Aubuchon aff. ¶ 11; Aubuchon dep. 131:17–132:7; Fulgoni dep. 89:10–24.

#### D. Detention of Heartwise Cereal by the State

39. The TDH has issued detention notices at warehouses of a number of Kellogg's wholesale customers around the state of Texas. Detention notices were served on customers in Dallas, Houston, San Antonio, El Paso, Lubbock, Tyler, Lufkin, and Sulphur Springs. Kellogg's customers affected by these notices are either grocery store chains or grocery supply wholesalers. None of the detention notices was served on retail establishments.

40. A sample of the notice of detentions issued, was the one provided to the Tom Thumb warehouse in Dallas. Affidavit of Michael W. Townsend ¶ 2 ("Townsend aff."); affidavit of Michael P. Lehmann ("Lehmann aff.") exhibit 2. It stated that the product was "detained because it is misbranded—considered an unapproved new drug."

#### E. TDH's Reasons for Serving the Notices of Detention

41. There are four reasons, according to Dennis E. Baker, director of the division of food and drugs of the TDH, why TDH decided to serve the notices to detain Heartwise cereal. First, the product is named "Heartwise." Second, the labelling bears heart-shaped symbols on it. Third, the label back panels contain what TDH has alleged are endorsements from the Henry Ford Hospital and the Riverside Institute. For these three reasons, Heartwise was adjudged to be an "unapproved new drug" under Texas H. & S.Code § 431.114(a)(1), (2). A fourth reason of de-

---

2. These letters have been filed with the court under seal, pursuant to an order of the magistrate. The court now finds that there is no need to keep these letters under seal and hereby orders that the magistrate's September 27, 1990 order is modified so as to delete any requirement that these letters be filed under seal or that these letters cannot be disclosed to anyone other than counsel.

tention was one of material omission: the fact that former Heartwise packaging lacked an allergic reaction advisory. As a consequence, TDH determined the cereal was "adulterated" under Tex.H. & S.Code § 431.081(a)(1). These reasons were set forth in a letter sent by Baker to Kellogg on September 4, 1990. Deposition of Dennis E. Baker ("Baker dep.") 51:5–55:24, 233:12–22; Lehmann aff. exhibit 3.

42. In so determining, TDH did not make any findings that Heartwise cereal was misbranded or that it was an unapproved new drug. Baker dep. 53:5–14.

43. Nevertheless, TDH concluded that it had probable cause to believe under Tex.H. & S.Code § 431.048(a) that Heartwise cereal was misbranded or an unapproved new drug. Baker dep. 53:15–20; deposition of Robert Daniel Sowards, Jr. 171:16–172:12, 220:20–222:8.

44. In reaching its "probable cause" determination, TDH relied on three pieces of information: the cereal box itself; some oral discussions with representatives of the FDA; and a copy of a letter written to Kellogg by Ronald G. Chesemore, the FDA's Acting Associate Commissioner for Regulatory Affairs, dated September 29, 1989. Baker dep. 56:24–57:10.

45. Because Kellogg had already sold Heartwise to its customers, the effect of the TDH detention is to stop the sale of Heartwise by Kellogg's wholesale customers. Kellogg has not produced any probative evidence of any effect on Kellogg's commercial speech rights as the result of this detention.

46. Some of Kellogg's customers have stopped carrying Heartwise of their own volition and without any actual or threatened detention action. Affidavit of Patrick J. Strutzel ¶¶ 2–5; Townsend aff. ¶ 7. Kellogg has failed to demonstrate that the preliminary relief it seeks will have any effect on the conduct of these customers.

47. Kellogg has failed to present reliable evidence of harm that will befall it if the court does not enjoin future detentions by TDH and direct TDH to withdraw existing detentions.

## CONCLUSIONS OF LAW

### I. *Standards for a Preliminary Injunction*

1. Kellogg seeks preliminary injunctive relief to prevent further detention of Heartwise by TDH and to compel TDH to rescind the detention notices already issued at several warehouses in Texas.

■ 2. The extraordinary relief sought by Kellogg may issue only where (1) there is a substantial likelihood that Kellogg will prevail on the merits; (2) there is a substantial threat that irreparable harm will result to Kellogg if the injunction is not granted; (3) the threatened injury to Kellogg outweighs the threatened harm to the State; and (4) the granting of a preliminary injunction will not disserve the public interest. *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572–73 (5th Cir.1974). Kellogg must satisfy the cumulative burden of clearly carrying its burden of persuasion on each of these four elements before a preliminary injunction can be granted. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir.1987); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985).

■ 3. Kellogg is also seeking mandatory injunctive relief because TDH's notices of detention have already been issued. Although an obviously extraordinary remedy, such relief is permissible where the facts and law clearly favor the movant. *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir.1976). Therefore, if the status quo now existing (partial detention of Kellogg's product) is a source of irreparable injury and the product of a violation of Kellogg's constitutional rights, the court may order the State to take action to restore the situation to the status quo that existed when the complaint was filed. *See, e.g., Canal Authority*, supra, 489 F.2d at 576.

### A. *Likelihood of Success on the Merits*

4. As noted above, the complaint in this action alleges that the State's conduct unduly burdens interstate commerce in violation of the Commerce Clause, is violative of

the Supremacy Clause because it is inconsistent with the policies of the FDA and FTC, abridges the right of free speech guaranteed by the First Amendment, and is violative of the right of equal protection guaranteed by the Fourteenth Amendment. Count six of Kellogg's complaint also seeks a declaration that Heartwise is not being sold in violation of the Texas Act. To determine the likelihood of success on these claims, it is necessary to analyze in depth the law and facts pertaining to each of them.

### 1. *The Commerce Clause*

5. The Commerce Clause of the United States Constitution (U.S. Const., Art. 1, § 8) gives Congress the power to regulate interstate commerce. It is not disputed that Heartwise cereal is sold in interstate commerce.

■ 6. For purposes of this motion, Kellogg does not contend that the Texas Act on its face discriminates against interstate commerce. Instead, Kellogg contends that the Act, as applied by the State to a nationally sold product with a national advertising program, places a burden on interstate commerce that outweighs any local governmental interests. Complaint ¶¶ 32–37.

7. Kellogg has provided this court with no real support for its assertion that the Texas Act or the acts of the state officials conflict with federal policy. The relevant provisions of the Texas Act are identical to the corresponding provisions of the federal FDCA. *Compare, e.g.,* FDCA § 201(g) [21 U.S.C. § 321(g)] *with* Texas Act § 431.002(13) (definition of "drug"); FDCA § 201(p) [21 U.S.C. § 321(p)] *with* Texas Act § 431.002(24) (definition of "new drug"); and FDCA § 301 [21 U.S.C. § 331] *with* Texas Act § 431.021 (prohibited acts).

8. The Commerce Clause limits the power of states to erect barriers against interstate trade. *Lewis v. B.T. Investment Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). The rationale behind the Commerce Clause is to allow a free flow of trade and to prevent outright protectionism. *New Energy Company of Indiana v. Limbach,* 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807–08, 100 L.Ed.2d 302 (1988). However, "the states retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis,* above, 447 U.S. at 36, 100 S.Ct. at 2015. Moreover, because the State in this case is enforcing a standard that is identical to the federal standard, this court can discern no burden on interstate commerce, inasmuch as the practices that the State seeks to prohibit are uniformly illegal throughout the nation.

### 2. *Preemption of the Texas Act*

9. Since the court can discern no burden on interstate commerce from the Texas Act, which is all but identical to federal law, it need not determine Kellogg's preemption claim. Alternatively, even if the Texas Act does incidentally affect interstate commerce, the burden on interstate commerce is clearly outweighed by the local benefits received by the public. *See Pharmaceutical Society of the State of New York, Inc. v. Lefkowitz,* 586 F.2d 953, 957 (2d Cir.1978). To protect consumers, states have traditionally regulated foods marketed within their borders. *Grocery Manufacturers of America, Inc. v. Gerace,* 755 F.2d 993, 1003 (2d Cir.), *cert. denied,* 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985).

10. Kellogg has therefore failed to clearly carry its burden of persuading the court that there is a substantial likelihood it will prevail on this claim.

■ 11. Kellogg has also made preemption claims under the Supremacy Clause of the United States Constitution, which provides that the "laws of the United States ... shall be the supreme law of the land." U.S. Const., Art. VI, cl. 2. Here, Kellogg claims that the State's enforcement action against Heartwise is preempted by the regulatory policies of the FDA and FTC concerning health messages by food manufacturers and allergic reaction advisories. Kellogg does not claim that either the FDCA or the FTC Act facially preempts the Texas Act or that the Texas Act may not be enforced in appropriate circum-

stances. Rather, Kellogg argues that in *this* circumstance, the State's enforcement of the Texas Act is inconsistent with FDA and FTC policies and stands as an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting the FTC Act and FDCA. Complaint ¶¶ 41 and 46.

12. In considering the doctrine of pre-emption and its application in this case, the Fifth Circuit, in *Burlington Northern Railroad Company v. Public Utility Commission of Texas*, 812 F.2d 231, 234 (5th Cir.1987), set out three grounds upon which a state law may be preempted by federal law. First, federal law may preempt state law if Congress explicitly defines the extent to which it intends to preempt state law. Second, in the absence of express preemptive language, Congress may indicate an intent to occupy an entire field of regulation. Third, if Congress has not displaced state regulation entirely, it may preempt state law to the extent that the state law actually conflicts with federal law. *Accord, California v. ARC America Corporation*, 490 U.S. 93, 100–01, 109 S.Ct. 1661, 1664–65, 104 L.Ed.2d 86 (1989). Kellogg's claims that the Texas Act is preempted will be discussed with respect to the three grounds for preemption set out in *Burlington Northern Railroad Company*, above.

13. The FDCA does not expressly preempt state regulation of the labelling and sale of food and drugs. *Jones v. Rath Packing Company*, 430 U.S. 519, 538, 97 S.Ct. 1305, 1316, 51 L.Ed.2d 604 (1977). In its February 1990 proposal regarding disease-related claims for foods, FDA explicitly rejected the notion that the law in this area provides for explicit preemption. 55 Fed.Reg. 5176, 5191 (February 13, 1990). There is no express preemption.

14. Similarly, there is no indication that Congress intended to occupy the field of regulating the sale and labelling of food and drugs. Regulation of the sale and labelling of food and drugs is a field traditionally occupied jointly by the states and the federal government. Therefore, Kellogg must

present a showing of implicit pre-emption of the whole field, or of a conflict between a particular local provision and the federal scheme, that is strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation.

*Hillsborough County, Florida v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 716, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985).

[T]o "infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence."

*Moore v. Kimberly–Clark Corporation*, 867 F.2d 243, 245 (5th Cir.1989) (quoting *Hillsborough County*, 471 U.S. at 717, 105 S.Ct. at 2377). *See also Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 911–13 (5th Cir.1987), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988).

15. In its February 1990 proposal, FDA also explicitly rejected the notion that FDA should exercise any preemption authority in the area of health claim regulation. 55 Fed.Reg. 5176, 5191 (February 13, 1990).

16. Preemption may also exist when there is an actual conflict between state and federal law, wherein compliance with state law will require a violation of federal law. *Grocery Manufacturers of America, Inc.*, above, 755 F.2d at 999. However, that is not the case here. Comparison of the definitions and provisions of the FDCA with those of the Texas Act demonstrates that they are in essence identical with respect to the claims at issue here. *See* conclusion of law 7 above.

17. Therefore, Kellogg is not at risk of violating federal law if it complies with Texas law. The mere fact that Texas may have imposed on Kellogg more extensive duties than FDA has imposed, as of this date, does not make it impossible for Kellogg to comply with both the Texas Act

and the FDCA. *See ARC America Corporation,* above, 490 U.S. at 102–03, 109 S.Ct. at 1665–66; *Osburn,* above, 825 F.2d at 912–13.

18. Kellogg is wrong in presuming, merely from the fact that FDA has not yet acted, that FDA in fact does not intend to act to do exactly what the State has done. *See* FDA's September 27, 1990 letter to Kellogg, Albracht aff. exhibit 1; finding of fact 23 above.

19. Nor has Kellogg established that the requirements of the Texas Act stand as an obstacle to federal purposes and objectives. Kellogg's theory seems to be that the federal government intended to create a scheme of uniform standards for sellers of drugs who advertise nationally and that state regulation interferes with that scheme. Kellogg has brought forward nothing, however, to support this claim.

20. Not only is the purpose of the Texas Act identical to its federal counterpart, the state drug regulation scheme is an integral part of the federal drug regulation scheme. Several officials in TDH are commissioned FDA agents. Baker dep. 128:6–10. The purpose of these commissions is to facilitate coordinated enforcement of the FDCA and the Texas Act. Baker dep. 138:16–139:10. The FDA contracts with the State to have state officials conduct various FDA functions. Baker dep. 128:1–4. Kellogg is correct in its assertion that the federal government has enacted a comprehensive scheme of drug regulation. It is incorrect in its assertion, however, that Texas's scheme conflicts with the federal scheme. To the contrary, the state and federal schemes form an interlocking system of protection from the sale of misbranded, adulterated, or unapproved new drugs.

21. The practices in which Kellogg has engaged are properly the subject of an enforcement action by the State pursuant to the Texas Act. Principles of federalism strongly support state law enforcement in this area. There is therefore no FDCA preemption.

22. Kellogg next asserts that the FTC Act preempts state law. Kellogg's complaint ¶¶ 44–48. Congress has not, in the FTC Act or elsewhere, expressly preempted state laws regulating false, misleading, or deceptive advertising by companies. *Patterson Drug Company v. Kingery,* 305 F.Supp. 821, 825 (W.D. Va.1969) (three judge court).

23. In fact, the FTC Act has long enjoyed a cooperative relationship with state laws. The FTC itself has encouraged state deceptive practices laws because problems in the marketplace go beyond the enforcement capabilities of the federal government. D. PRIDGEN, CONSUMER PROTECTION AND THE LAW § 3.02[1] (1986). *See Double–Eagle Lubricants, Inc. v. State of Texas,* 248 F.Supp. 515, 517 (N.D.Tex.1965), *appeal dism'd for want of jurisdiction,* 384 U.S. 434, 86 S.Ct. 1601, 16 L.Ed.2d 670 (1966).

24. Texas, as well as all other states, has historically enforced deceptive practices laws as part of its police powers to protect the physical and economic well-being of its citizens. *Friedman v. Rogers,* 440 U.S. 1, 15, 99 S.Ct. 887, 897, 59 L.Ed.2d 100 (1979).

25. Where such is the case, the Supreme Court has held that there exists an assumption that the historic police powers of the State are not to be superseded by federal acts unless that was the "clear and manifest purpose of Congress." *Rath Packing Company,* above, 430 U.S. at 525, 97 S.Ct. at 1309 (quoting *Rice v. Santa Fe Elevator Corporation,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). No Congressional purpose to supersede the Texas Act, clear and manifest or otherwise, has been shown.

26. Finally, there is no conflict between the regulation of misbranding at issue here and FTC laws, rules, or regulations. Preemption exists only to the extent necessary to avoid an impediment to the objectives of Congress. *Michigan Canners and Freezers Association, Inc. v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 127, 94 S.Ct. 383, 389–90, 38 L.Ed.2d 348 (1973); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61

S.Ct. 399, 404, 85 L.Ed. 581 (1941). The Supreme Court has repeatedly noted that mere federal regulation in a field of commerce should not automatically be deemed preemptive of state regulatory authority. The nature of the regulation must permit no other conclusion, or Congress must have "unmistakingly so ordained." *R.J. Reynolds Tobacco Company v. Durham County, North Carolina,* 479 U.S. 130, 140, 107 S.Ct. 499, 507, 93 L.Ed.2d 449 (1986); *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). That is not the case here.

27. Kellogg is not placed in the position of complying with Texas law at the peril of violating federal law. A state is free to set and enforce more rigorous standards for a company than those set or enforced by the federal government. *See ARC America Corporation,* above, 490 U.S. at 102–03, 109 S.Ct. at 1665–66.

28. There is no evidence of any action or intent on the part of Congress to preempt state regulation of misbranded foods and drugs, under either the FDCA or the FTC Act.

29. The court therefore concludes that Kellogg is not likely to prevail on its claims of Supremacy Clause preemption.

### 3. *The First Amendment*

■ 30. Kellogg's next constitutional claim is that the state's enforcement action is an abridgement of its commercial speech rights in violation of the First Amendment to the United States Constitution.

31. It is well-recognized that commercial speech is entitled to less protection than non-commercial speech. "To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech." *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).

32. Kellogg's invocation of the protections of the First Amendment is misplaced.

Kellogg has failed to introduce facts that show any connection between the actions of the State in detaining Heartwise and any diminution of the speech rights of Kellogg. Nor, it appears, could Kellogg meet that burden. The detentions only restrain the ability of the distributors who received the detention order to *sell* the product. Finding of fact 45 above. Speech, as such, is not restrained. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982).

33. Under the Constitution, a distinction has long been drawn between speech and action. For example, anyone is free to urge that a law should be changed. In some instances, it is even possible to urge that others violate a law and still be entitled to First Amendment protection. But there is no right to act in violation of a law and claim First Amendment protection.

34. Therefore, Texas could ban the sale of all food products containing psyllium, and Kellogg could not claim a free speech right to sell such a product. In fact, here Texas has taken a less drastic step. It has merely said that a food product sold in Texas that contains psyllium in an amount equivalent to that found in bulk laxatives must contain an adequate warning about the possible allergenic and intestinal effects of ingesting psyllium. In addition, Texas has only said that the labelling is misbranded, because of certain claims made on the label. A requirement that the claims be removed, in order to sell the product, is certainly less restrictive than a flat prohibition of the sale of the product.

35. There is nothing about the detentions that restrains Kellogg's right to say whatever it wants about the health benefits of a high-fiber diet in general or psyllium in particular.

36. The court therefore determines that Kellogg is not likely to prevail on its First Amendment claim.

### 4. *Equal Protection*

■ 37. Last, Kellogg alleges that the State has selectively and discriminatorily challenged Kellogg's labelling of Heartwise, depriving Kellogg of its right to

equal protection of the law, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. Complaint ¶¶ 59–61.

38. A selective prosecution claim rests exclusively on the Equal Protection Clause of the Fourteenth Amendment. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Courts are hesitant to permit an examination of a prosecutor's exercise of discretion.

> [T]he Government retains "broad discretion" as to whom to prosecute.... This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.... Examining the basis of a prosecution delays the ... proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

*Wayte v. United States,* 470 U.S. 598, 607–08, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985) (citations omitted).

39. To establish a prima facie case of selective prosecution, Kellogg bears the heavy burden of showing that enforcement against it "had a discriminatory effect and ... was motivated by a discriminatory purpose." *Wayte,* above, 470 U.S. at 608, 105 S.Ct. at 1531. Specifically, Kellogg must establish both (1) that it has been singled out while others similarly situated have not been prosecuted and (2) that the decision to prosecute it was invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or Kellogg's exercise of constitutional rights. *United States v. Greenwood,* 796 F.2d 49, 52 (4th Cir.1986); *United States v. Murdock,* 548 F.2d 599, 600 (5th Cir.1977).

40. The State has taken action against the only other company (General Mills) that has recently sold psyllium in a food (Benefit cereal). The State advised General Mills that it would be in violation of State law for it to market a breakfast cereal containing psyllium in Texas. General Mills chose not to do so. Finding of fact 26.

41. The State has also taken enforcement action against a number of other companies that made a variety of cholesterol-related claims for their products, including Fleischmann margarine, Mazola margarine, and (in a case recently in litigation in this district) Quaker Oats. Findings of fact 29–30.

42. Thus, Kellogg has failed to introduce specific facts which show that others who are similarly situated to Kellogg are not being prosecuted.

43. With reference to the second part of the selective prosecution test, Kellogg bears a "very heavy burden in demonstrating invidious purpose which invades or overrides the prosecutorial discretion." The "mere exercise of some selectivity by the government in instituting prosecutions is not itself a constitutional violation." *Home Depot, Inc. v. Guste,* 773 F.2d 616, 627 (5th Cir.1985) (citing *United States v. Greene,* 697 F.2d 1229, 1234–35 (5th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983)).

44. Kellogg has also failed to introduce any facts, colorable or otherwise, that the State acted with discriminatory intent. The Supreme Court has stated that a showing of discriminatory purpose requires Kellogg to show that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects ..." *Wayte,* above, 470 U.S. at 610, 105 S.Ct. at 1532.

45. The mere conjectured existence of some selectivity by the State in instituting prosecutions is not per se constitutionally prohibited by the Fourteenth Amendment. *United States v. Hoover,* 727 F.2d 387, 389–91 (5th Cir.1984). Absent some invid-

ious element, the government's decision to prosecute cannot be challenged. *United States v. Jennings*, 724 F.2d 436, 445 n. 12 (5th Cir.), *cert. denied*, 467 U.S. 1227, 104 S.Ct. 2682, 81 L.Ed.2d 877 (1984). Kellogg has failed to present this court with any evidence in this regard.

46. The court therefore determines that Kellogg is not likely to prevail on its equal protection claim.

### 5. Declaratory Relief Under the Texas Act

■ 47. Finally, Kellogg has asserted a claim that its conduct does not violate the Texas Act. On this claim as well, there is no likelihood that it will prevail on the merits. The burden here, as with the affirmative claims raised by Kellogg, is on Kellogg to prove the existence of facts underlying its allegations. *See Indium Corporation of America v. Semi–Alloys, Inc.*, 781 F.2d 879, 883 (Fed.Cir.1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986); 10A WRIGHT, MILLER & KANE, Federal Practice and Procedure § 2770 (2d ed. 1983).

48. The fundamental question is whether Kellogg has demonstrated that the State acted illegally in detaining Heartwise. The place to start in this analysis is the Texas Act.

49. There are two primary definitions at Issue: "drug" and "new drug." A "drug" is defined in § 431.002(13) of the Texas Act as any article that is "designed or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals."

50. A "new drug" is defined in § 431.002(24) of the Texas Act as any drug (1) "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof" and (2) that has not, other than in investigations to determine its safe-

ty and effectiveness, "been used for a material extent or for a material time under such conditions."

51. The initial inquiry, therefore, is whether Heartwise is considered a "drug." If it is not a drug, then the inquiry ceases. If it is a drug, then the second question is whether it is a "new drug." If Heartwise is indeed a new drug, then its promotion and sale is illegal in Texas. Texas Act § 431.114.

52. First, the court must inquire whether Kellogg designed Heartwise "for use in the diagnosis, cure, mitigation, treatment, or prevention of disease." The evidence suggests that to be the case. Kellogg apparently set out to design a product that was sufficiently high in soluble fiber that it could be promoted as a significant ingredient in a cholesterol-lowering regimen. *See* findings of fact 27–28.

53. Second, to see how Kellogg intended that consumers use its products, it is appropriate to consider the actual package labelling and reasonable inferences to be drawn therefrom. *United States v. Undetermined Quantities of an Article of Drug Labeled as "Exachol,"* 716 F.Supp. 787, 791 (S.D.N.Y.1989); *see also Kordel v. United States*, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948); *United States v. 250 Jars, Etc., of U.S. Fancy Pure Honey*, 218 F.Supp. 208 (E.D.Mich.1963).[3]

54. Kellogg claims that Heartwise will lower cholesterol levels. Findings of fact 27–28.

55. A representation that a product can lower serum cholesterol, or that a product can cure, mitigate, treat, or prevent elevated serum cholesterol, is the same as a representation that that product can be used in the cure, mitigation, treatment, or prevention of elevated serum cholesterol and diseases of the circulatory system. Another federal court has recently spoken to claims of this nature and has concluded that claims that a product reduces cholesterol are "drug" claims. *Undetermined Quantities of an Article of Drug Labeled as "Exachol,"* above, 716 F.Supp. at 792–

---

**3.** There are no interpretations of these provisions of Texas law. However, since they are in all relevant aspects identical to federal law, interpretations of the federal law are helpful.

93. That is precisely what Kellogg has done here.

56. Kellogg's design and intended use of Heartwise makes it a "drug."

57. Having failed to show that Heartwise is generally recognized as safe and effective in the cure, mitigation, treatment, or prevention of elevated serum cholesterol and diseases of the circulatory system, and having failed to show that Heartwise has been used to a material extent and for a material time in the cure, mitigation, treatment, or prevention of elevated serum cholesterol and diseases of the circulatory system, Kellogg has failed to rebut the determination made by TDH that Heartwise is therefore a "new drug" under the Texas Act.

58. Therefore, sale of Heartwise in Texas violates §§ 431.114 and 431.021 of the Texas Act.

59. In addition, § 431.183(a)(7) of the Texas Act provides that an advertisement of a drug is false if it represents that the drug affects diseases of the circulatory system. Therefore, the labelling of Heartwise is *per se* misbranded, pursuant to §§ 431.082(a) and 431.112(a)(1) of the Texas Act.

60. Kellogg's claim that Heartwise is just a "food" does not mean that Heartwise should not be subjected to the more stringent criteria applied to drugs. If Kellogg chooses to make drug claims for its products, those products should be subject to the drug laws. "When healing powers are attributed to 'foods,' they become drugs within the meaning of the Act." *United States v. Articles of Drug, Etc.*, 263 F.Supp. 212, 215 (D.Neb.1967). *See also National Nutritional Foods Association v. Mathews*, 557 F.2d 325, 334 (2d Cir.1977); *Nutrilab, Inc. v. Schweiker*, 713 F.2d 335, 336 (7th Cir.1983).

61. The second part of this inquiry is whether the admitted facts that Heartwise can cause allergic reactions and that Kellogg did not warn of this possibility constitute misbranding in violation of Texas law. The Texas Legislature has directed that, in determining whether an item is misbranded, "there shall be taken into account ... the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof...." Texas Act § 431.003. Because Kellogg's failure to disclose the allergenicity of Heartwise was material, the court concludes that Heartwise is misbranded under the Texas Act.

62. The decision to detain was made by officials at the TDH whose job it is to decide when products must be detained. The evidence offered by Kellogg failed to negate the judgment of these officials that detention was necessary. *See Brewster v. City of Dallas*, 703 F.Supp. 1260 (N.D.Tex. 1988). Absent a full evidentiary hearing, these decisions should not be lightly disregarded.

63. The detention action was only taken after efforts by these officials to resolve their concerns were rejected by Kellogg. Complaint ¶ 27.

64. Kellogg has not brought forward facts to show that the product is not misbranded under Texas law, but merely argues that (because of the Commerce Clause, federal preemption, the Equal Protection Clause, or the First Amendment) it is free to misbrand and thus violate Texas law. Having rejected these constitutional arguments, the court also rejects the notion that these officials made an incorrect decision.

65. The court therefore determines that Kellogg is not likely to prevail on its claim for declaratory relief.

66. Kellogg has failed to demonstrate a likelihood of success on the merits for any of its claims. Therefore, the preliminary injunction must be denied. The court will nevertheless discuss the remaining three prongs of the test for preliminary relief.

### B. *Irreparable Harm*

67. The second requirement for obtaining a preliminary injunction in this Circuit is that Kellogg has suffered irreparable injury. Conclusion of law 2.

68. Kellogg correctly notes that irreparable harm may be presumed from a showing of a violation of constitutional rights. 11 WRIGHT & MILLER, above, Federal Practice and Procedure § 2948 at 440. However, Kellogg has failed to meet its burden of establishing a probable violation of any such rights. Therefore, actual injury must be shown in the record before the court.

69. The only testimony before the court with respect to injury is that of John Aubuchon, a long-time employee of Kellogg whose testimony was rife with hearsay and conjecture. For this reason, the court has determined that this testimony is entitled to little weight. *See Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.,* 446 F.2d 353, 357 (5th Cir. 1971) (plaintiffs' extensive use of hearsay in affidavits of plaintiffs' managerial employees contributed to error requiring reversal of district court's entry of preliminary injunction).

70. Kellogg has therefore failed to present the court with credible evidence to establish irreparable injury as the result of continued or future detention of Heartwise by the States.

### C. *Whether the Threatened Injury to Kellogg Outweighs the Threatened Harm to the State*

71. The third requirement for obtaining preliminary injunctive relief is that the injury to Kellogg without injunctive relief outweighs the threatened harm to the State if such relief is granted. Conclusion of law 2.

72. Kellogg has failed to meet its burden of showing that the balance of harm is in its favor because it has failed to demonstrate irreparable harm at all. Conclusions of law 69–70.

73. In any event, the harm to the State and its citizens—if the State is required to rescind its existing detention notices and to refrain from issuing additional detention notices—outweighs any conjectured harm to Kellogg. Kellogg has failed to demonstrate that stopping Kellogg's customers from violating Texas and federal food and drug laws will stop Kellogg from market-

ing and selling its products just as it has been doing for decades prior to the time it started making these claims.

74. The detention is not mandatory, but merely prohibitory. In fact, the actions taken by TDH merely require Kellogg's wholesale customers to comply with state and federal laws that have been on the books for years. A balancing of hardships need not come into the analysis at all. *See* 11 WRIGHT & MILLER, above, Federal Practice & Procedure, § 2948 at 461.

75. In addition, the State's extremely strong likelihood of success on the merits outweighs any conjectured harm to Kellogg occasioned by complying with Texas law when doing business in Texas. *See Canal Authority of State of Florida,* above, 489 F.2d at 576.

### D. *Public Interest*

76. Kellogg bears the burden of proving that the order sought "will not disserve the public interest" before a temporary restraining order or preliminary injunction can be granted. *Clark,* above, 812 F.2d at 993.

77. The public benefits to be derived from Kellogg's compliance with Texas and federal food and drug laws are clear. "It is well established that the public interest may be declared in the form of a statute...." *Electronic Data Systems Corporation Iran v. Social Security Organization of the Government of Iran,* 508 F.Supp. 1350, 1357 (N.D.Tex.), *aff'd in part, vacated in part,* 651 F.2d 1007 (5th Cir.1981); *Hunt v. United States Securities & Exchange Commission,* 520 F.Supp. 580, 609 (N.D.Tex.1981); 11 WRIGHT & MILLER, above, Federal Practice & Procedure, § 2948 at 460.

78. The benefits of a food and drug law as a consumer protection law have been long recognized. "The purposes of [the federal Act] thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." *United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943); *United States v. Vitasafe Corporation,* 345 F.2d 864, 870

(3rd Cir.), *cert. denied,* 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 (1965).

79. The public benefits to be derived from the food and drug laws are very real and extensive. It is appropriate to rely on the Texas Legislature's determination that detention of products that violate the Texas Act is an appropriate remedy. *Cf. United States v. Buttorff,* 761 F.2d 1056 (5th Cir. 1985). Permitting Kellogg to market its products in violation of the Texas Act deprives the public of these benefits, and does not serve the public interest. Kellogg has failed to prove the contrary.

80. To the extent necessary, any finding of fact deemed to be a conclusion of law herein is adopted as such. Conversely, any conclusion of law deemed to be a finding of fact herein is also adopted as such.

## II. *Conclusion*

Accordingly, Kellogg's motion for a preliminary injunction is DENIED.

SO ORDERED.

### ORDER

By letter to the court dated April 5, 1991, counsel for defendants requests the court to amend its memorandum order of April 3, 1991, which denied plaintiff's motion for a preliminary injunction.

The court can take judicial notice of its own records. Rule 201, F.R.Evid. Conclusion of law 41 in the April 3, 1991 memorandum order is amended by deleting the language "still in litigation" and substituting therefor the language "recently in litigation" to reflect the dismissal of the Quaker Oats case on February 7, 1991.

The style of this case is also amended, in accordance with finding of fact 4 and Rule 25(d)(1), F.R.Civ.P., to reflect the fact that Dan Morales has succeeded Jim Mattox as attorney general of Texas.

SO ORDERED.